**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **REDEMPTION COMMUNITY** | * | |
| **CHURCH,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. **PJM 18-411** |
| | * | |
| **CITY OF LAUREL, MARYLAND** | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM OPINION

In 2015, Redemption Community Church (the "Church"), a non-denominational Christian church with currently between 15 and 20 congregants, purchased a property at 385 Main Street in Laurel, Maryland (the "Property") with the intention of operating a coffee shop during the week and a house of worship on Sunday mornings. The Property is located inside the City of Laurel's Commercial Village Zone ("C-V Zone"), which since the date of the purchase has required houses of worship located on less than one acre of land to apply for and receive a special exception in order to obtain a Use & Occupancy ("U&O") permit. On April 3, 2017, after renovating the Property, the Church received a U&O permit for a for-profit coffee shop. The Church never applied for and never received such a permit to host worship services. On April 5, 2017, the coffee shop opened its doors, and on Sunday, April 9, 2017, the Church held its first worship service there.

On January 26, 2018, the Church received a cease and desist letter from the City of Laurel ("Laurel" or the "City of Laurel") directing it to stop holding worship services or else be subject to a $250 fine per day. The Church immediately ceased holding services.

1

On February 9, 2018, the Church filed a Complaint in this Court, alleging that Laurel's zoning provision requiring houses of worship located on less than one acre to obtain a special exception violates various provisions of the United States Constitution and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* On February 12, 2018, the Church filed a Motion for Preliminary Injunction, still pending, asking the Court to enjoin Laurel from enforcing the relevant provision of its zoning code. ECF No. 7. Laurel has filed a Motion to Dismiss, or in the Alternative, for Summary Judgment. ECF No. 22. Oral argument on the Motion to Dismiss was heard on June 5, 2018.

For the following reasons, the Motion to Dismiss is **DENIED**. The Motion for Summary Judgment is **MOOT**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Redemption Community Church is a non-denominational Christian church currently with a congregation of between 15 to 20 worshipers. Complaint ¶¶ 15, 18, ECF No. 1. It was incorporated in 1969 in Montgomery County, Maryland as a nonprofit corporation and was initially named the Covenant Orthodox Presbyterian Church. *Id.* ¶¶ 15, 20. Church members purport to have "sincerely-held religious beliefs that they are to regularly assemble with others to pray, study the Bible, sing religious songs, and share biblical insight." *Id.* ¶ 21. A "particular calling" of the Church is to "bring the Gospel to the homeless and underprivileged in its community." *Id.* ¶ 22.

In order to fulfil its religious mission, in the summer of 2014 the Church began searching for a property that it could operate both as a non-profit coffee shop and house of worship. *Id.* ¶¶ 23-25. The thought was to operate a non-profit coffee shop on Mondays through Saturdays (the

proceeds of which would be donated to local community organizations) and serve as a house of worship on Sundays. *Id.* ¶¶ 25-26.

Between late 2014 and early 2015, the Church located a property that it believed met its desired specifications. The Property was located at 385 Main Street, Laurel, Maryland 20707. *Id.* ¶ 27. The Property was a three-story structure situated on a 5,115 square-foot lot, which was less than one acre, and had approximately 4,500 square feet of usable space. *Id.* ¶¶ 28-29. The Property was advertised as a "Structure Type" for "Retail, Church/School, Office, [or] Office Building" uses. Complaint Ex. 1, ECF No. 1-3. The Property was "centrally located in the area in which the Church desire[d] to minister", namely, the heart of Laurel's Commercial Village zone. Complaint ¶ 31.

On or about February 6, 2015, Trustees of the Church visited the Property, accompanied by the Fire Marshal of the City, and allegedly communicated to him their desire to use the location both as a non-profit coffee shop and house of worship. Complaint ¶ 32. Very soon thereafter, on February 17, 2015, the Church signed a Purchase Agreement for the Property, and on March 18, 2015, it closed on the Property for approximately $470,000. *Id.* ¶¶ 39, 40.

In preparation for its purchase of the Property, on February 12, 2015, the Church applied for a parking waiver pursuant to Section 20-16.6 of Laurel's Unified Land Development Code (the "Code"), since the number of parking spaces available at the Property was less than that mandated by the Code. *Id.* ¶¶ 36, 38. The Church asserts that such parking waivers are normally required for institutions in the C-V zone due to the limited available parking on Main Street and the surrounding properties. *Id.* ¶ 36. On March 10, 2015, Church representatives testified at a Planning Commission meeting, after which their application for the parking waiver was approved for both the proposed coffee shop and church services. *Id.* ¶40; *see also* Complaint Ex.

2, ECF No. 1-4. However, on April 14, 2015, City officials revoked their approval of the waiver on the grounds that Church representatives had purportedly submitted evidence at the hearing that contradicted representations it had made in the waiver application. Complaint ¶ 50; Complaint Ex. 3, ECF No. 1-5.

An additional hurdle to the Church's plans came as a result of changes to Laurel's zoning regulations. On February 9, 2015, three days after Church Trustees had visited the Property along with the City Fire Marshal, the Laurel City Council proposed Text Amendment 237 to the City Code, which would exclude non-profit businesses from operating within the C-V zone. Complaint ¶ 42. On March 9, 2015, Amendment 237 passed. *Id.* ¶ 43.

Then, on March 23, 2015, the City Council proposed Text Amendment 238, which would amend the Code's "Table of Commercial Uses" (the "Table"). *Id.* ¶ 44; Motion to Dismiss ("MTD") Ex. I, ECF No. 22-11. The Table references various types of commercial uses in Laurel's six commercial zones, indicating as to each use whether it is "permitted" or not permitted in a given zone; "permitted, subject to the approval of a special exception"; "permitted as an accessory building"; or "prohibited." Complaint ¶ 90; Complaint Ex. 11, ECF No. 13. Amendment 238 proposed changing "house[s] of worship"[1] "[l]ocated on a lot less than 1 acre in size" from a "permitted" use to a "permitted [use], subject to the approval of a special exception." Complaint ¶¶ 92-95; Complaint Ex. 11, ECF No. 1-13. The Special Exception application requires an applicant to fill out a two-page application and attach: a Statement of Justification, an Existing Conditions Site Plan or Survey, a Proposed Site Plan or Survey (created by a professional engineer or surveyor), and a non-refundable $2,000.00 filing fee. Complaint ¶ 46; ECF No. 39-2.

---

[1] The Code defines "house of worship" as a "church, temple, synagogue, mosque, or other building specifically used for organized worship." The Code also provides that it "shall be unlawful as an accessory, ancillary or secondary to other uses on the same premise." Sec. 20-1.7 of the Code, Complaint Ex. 12, ECF No. 1-14.

On April 27, 2015, Amendment 238 passed. Complaint ¶ 47. The Amended Code not only incorporated the special exception requirement for houses of worship but also provided that the following institutions would be deemed "permitted" <u>without</u> a special exception: art and cultural centers; cinemas and "legitimate theater[s]"; open microphone venues; "Disc Jockeys"; karaoke; poetry or dramatic readings; theatres or halls for the performing arts, symphony, or community theatre; health clubs or spas; libraries, museums, and similar "noncommercial institutions"; "standard" restaurants; and schools for "business, art, music and similar uses." Complaint ¶ 91; Complaint Ex. 11, ECF No. 1-13.

On April 14, 2015, Church representatives "informally met" with two City Planning Commissioners, Bill Wellford and Mitzi Betman, who allegedly told the representatives that a parking waiver and U&O permit were only required with respect to "the preponderance of use of a given property." Complaint ¶ 51. Based on this understanding, and because of the passage of Text Amendment 237, the Church submitted a second application for a parking waiver based on the Property being used primarily as a for-profit coffee shop, *Id.* ¶¶ 58-59, and on December 8, 2015, the Church was granted the waiver. The Church then undertook what became a sixteen-month renovation of the Property. *Id.* ¶¶ 60-61. In October, 2016, when renovation was substantially complete, the Church applied for a U&O permit for a for-profit coffee shop, which it received on April 3, 2017. *Id.* ¶¶ 61-63. The Church did not file for a parking waiver or U&O permit to operate as a house of worship.

On April 5, 2017, the Property began operating as a for-profit coffee shop Mondays through Saturdays, and on Sunday, April 9, 2017, the Church held its first worship service there. *Id.* ¶¶ 65-66.

On July 11, 2017, a Church representative visited the Laurel Municipal Center to request a revised U&O permit, since the one granted to the Church on April 3, 2017 contained multiple typographical errors (for example, it misstated the building's square footage). *Id*. ¶¶ 64, 68. On July 27, 2017, while coming in to pick up the revised U&O, a Church representative was purportedly asked by City Planner Monta Burrough, "Are you doing church at the Property?" and "Are you having worship at the Property?", to which the Church representative allegedly responded that indeed "It held some worship gatherings on Sundays." *Id.* ¶¶ 69-71. That same day, the City sent a letter to the Church ordering that it cease and desist from holding worship services. *Id.* ¶ 72.

On August 2, 2017, Church representatives met with City Planner Burrough to discuss the cease and desist letter. *Id.* ¶ 76. During the meeting, Burrough reportedly asked the representatives if "people raise hands for worship at the Property?" [suggesting concern over an unusual form of worship?] and "Can you meet somewhere else until this blows over?" *Id*. ¶ 77.

Despite the cease and desist letter and the meeting with Burrough, the Church continued to conduct worship services at the Property on Sundays until January 26, 2018, when it received a second cease and desist letter from the City. *Id.* ¶¶ 80-81. This letter noted that the Church had been "operating as a House of Worship and hosting live entertainment without a City of Laurel Special Exception approval, which is in violation of the City of Laurel Unified Land Development Code Section *Sec. 20-22 and* is in violation of your Use and Occupancy permit." Complaint Ex. 9, ECF No. 1-11 (emphasis in original). The letter directed the Church to "cease immediately operating as a House of Worship and hosting live entertainment or the property owner will accumulate fines of $250 a day." *Id.* Following receipt of this second cease and desist letter, the Church stopped conducting worship services at the Property. Complaint ¶ 82.

On February 9, 2018, the Church filed suit against Laurel in this Court, asserting violations of the United States Constitution and RLUIPA. Specifically, the Church has alleged that the City's amended Code impermissibly discriminates against houses of worship by requiring those located on less than one acre located within the C-V Zone to obtain a special exception while not requiring the filing of a special exception for similarly situated secular assemblies and institutions. The Church argues that the Code, both on its face and as applied to its operation within the C-V zone, violates RLUIPA's "Equal Terms" provision, "Nondiscrimination" provision, and "Substantial Burden" provision, as well as the Free Exercise Clause, the Free Speech Clause, the Right to Peaceable Assembly, the Establishment Clause and the Equal Protection Clause of the Constitution.

Soon after filing its Complaint, the Church filed a Motion for Preliminary Injunction, asking the Court to enjoin Laurel from enforcing the special exception requirement of its zoning code. ECF No. 7.[2]

On March 20, 2018, Laurel filed a Motion to Dismiss, or in the Alternative, for Summary Judgment, arguing first that the Church's claims are not ripe because it has never applied for a special exception, ECF No. 22, and, second, that the Church has failed to state a claim under RLUIPA and the Constitution because it has not shown that houses of worship are subject to unequal treatment under the zoning laws. *Id.* The Court heard oral argument on the Motion to Dismiss on June 5, 2018.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). This standard requires "more than a sheer possibility that

---

[2] This Motion is still pending.

a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court will accept factual allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Indeed, the court need not accept legal conclusions couched as factual allegations or "unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Markets, Inc. v. J.D. Associates Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). In the end, the complaint must contain factual allegations sufficient to apprise a defendant of "what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted).

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This does not mean, however, that "*some* alleged factual dispute between the parties" defeats the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original).

### III.    ANALYSIS

### A.

Laurel argues that the Court should dismiss the Complaint for lack of ripeness because the Church never applied for, and was never denied, a special exception. Laurel cites *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), in which the Supreme Court held that a claim regarding the application of government regulations to property "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Id.* at 186.

The Church responds that Laurel's reliance on *Williamson County* is misplaced because *Williamson County* does not apply to facial claims, and because the Church sustained its injury when it was required to apply for a special exception, not when it was denied one.

The Fourth Circuit has long held that facial challenges to land-use regulations are ripe without a "final decision" on the law's application to the property. *Beacon Hill Farm Assocs. II Ltd. P'ship v. Loudoun Cty. Bd. of Su'rs*, 875 F.2d 1081 (4th Cir. 1989). In *Beacon Hill*, a landowner challenged a newly-passed zoning ordinance restricting development in Loudoun County's environmentally sensitive land areas. The district court dismissed the case on the grounds that the claims were not ripe for adjudication since the plaintiff had not submitted development plans for its property nor had it applied for a special exception to the ordinance. The Fourth Circuit reversed, finding that the facial attack on the ordinance "should not have been dismissed as being premature", noting that "there is an important distinction between a claim that the mere enactment of a statute is unconstitutional and a claim that the particular impact of government action on a specific piece of property is unconstitutional." *Id.* at 1084-85. (internal quotation marks omitted). Whereas the latter, as-applied claims, may require a final decision, the former, facial claims, do not. *Id.* 1083-84.

Because in the present case the Church's facial claims are brought under the theory that the passage of the zoning ordinance violates the Constitution and RLUIPA, under *Beacon Hill*, the Court finds those claims are ripe for decision at this time.

The Court is also asked to consider the Church's as-applied claims at this time. First, *Williamson County*, which dealt with a Constitutional takings claim, is distinguishable from the present case. There, the Supreme Court held that a final decision was necessary before considering takings claims because such claims require inquiry into "the economic impact of the

challenged action and the extent to which it interferes with reasonable investment-backed expectations," factors which "simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question. *Williamson County*, 473 U.S. at 191. But the same considerations are not present here. The Court need not wait for the Church to apply for, and be denied, a special exception to determine the financial impact the special exception process will have on the Church, or how the application process may have interfered with their ownership expectations. Nor is the Church claiming that the denial of a special exception has injured them; rather, the Church posits that it is injured just by having to apply for a special exception when similar secular institutions do not have to do so; i.e., the mere imposition of the special exception requirement is the alleged injury.

Furthermore, since *Williamson County*, the Supreme Court has clarified that the finality requirement is "a prudential rather than a jurisdictional rule . . . . [Courts] may determine that in some instances, the rule should not apply." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 545 (4th Cir. 2013) (citing *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 734 (1997); *Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 728 (2010)). As a result, courts have developed "several notable exceptions" to *Williamson County*'s finality requirement, including that "landowners are not required to resort to 'repetitive or unfair land-use procedures' to obtain a final decision." *Acorn Land, LLC v. Baltimore Cty., MD*, 402 F. App'x 809, 814 (4th Cir. 2010) (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 619 (2001)).

Here, the Church alleges that the special exception process unfairly targets houses of worship, since those on less than one acre are required to undergo the special exception process while similar secular institutions do not (What about houses of worship on <u>more</u> than one acre?).

Furthermore, the Church has plausibly suggested that the enactment of Amendment 238 was quite possibly related to use of the Property for worship purposes, since the Amendment was proposed but a week after the Church closed on the Property and passed just two weeks after its parking waiver was revoked. Complaint ¶¶ 45, 47, 50. This suggestion is buttressed by the allegations regarding City Planner Burrough's comments to Church representatives, immediately after which the Church received its first cease and desist letter demanding that it cease holding worship services. *Id.* ¶¶ 70-72; Complaint Ex. 8, ECF No 1-10. Such allegations, if proven, plausibly support the conclusion that the special exception process, as it applies to houses of worship, is "unfair" and that the Church need not go through it before the Court can consider the as-applied claims.

Since the Court finds that both the facial and as-applied claims are ripe, the Motion to Dismiss on those grounds will be **DENIED**.

## B.

Laurel also argues that the Church has failed to state a claim as to each of its Counts. The Court will consider each Count in turn.

### 1. *Violation Of RLUIPA's "Equal Terms" Provision (Count I)*

Under RLUIPA's "Equal Terms" Provision, "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C.A. § 2000cc (West). In general, there are "four elements of an Equal Terms violation:" (1) the plaintiff must be a religious assembly or institution, (2) subject to a land use regulation, and (3) the regulation must treat the religious assembly on less than equal terms than (4) a nonreligious assembly or institution. *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1307 (11th Cir. 2006).

It is undisputed that the Church is a religious institution seeking to use the Property as a "religious exercise" under RLUIPA and that the Property is subject to Laurel's zoning ordinance. *See* MTD at 24, ECF No. 22-1 ("The Church's allegedly desired use of the Property for worship gatherings would be operating a House of Worship . . . [and] [t]he City agrees that such use of property is a 'religious exercise' under RLUIPA."). Nor is it disputed that certain secular institutions are not required to apply for a special exception to operate in the C-V zone, but are "permitted" to operate there as a matter of right. See *Id.* at 12n.9 ("The 'Table of commercial uses,' Section 20-7.8 (4/24/2017), 'Exhibit 11' to Plaintiff's Complaint, confirms that the secular uses identified in the Complaint are generally permitted in the C-V Zone, showing a 'P' listing indicating 'that the use is permitted in the zone indicated' . . ."). What is disputed is whether requiring the Church to obtain a special exception and not requiring the listed secular institutions to do so "treats the religious assembly on less than equal terms."

There are essentially two tests for whether a law treats religious and secular institutions on equal terms. *See Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 291 (5th Cir. 2012) ("The approach of our sister circuits to facial Equal Terms Clause challenges fall 'roughly into two camps.'"). The stricter test, adopted by the Eleventh Circuit, "treats all land use regulations that facially differentiate between religious and nonreligious institutions as violations of the Clause." *Id.* (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1231 (11th Cir. 2004)); *see also Konikov v. Orange Cty., Fla.*, 410 F.3d 1317, 1324 (11th Cir. 2005) (For purposes of a RLUIPA equal terms challenge, the standard for determining whether it is proper to compare a religious group to a nonreligious group is not whether one is "similarly situated" to the other, . . . [r]ather, the relevant 'natural perimeter' for comparison is the category of 'assemblies and institutions' as set forth by RLUIPA.").

The second test of equal treatment is narrower and holds that "a violation of the Equal Terms Clause occurs only if a religious institution is treated less well than a similarly situated nonreligious comparator." *Opulent Life Church*, 697 F.3d at 291. The Third Circuit, for example, holds that "similarly situated" comparators are those that are similarly situated "as to the regulatory purpose," *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266 (3d Cir. 2007), while the Seventh Circuit looks to whether secular institutions are "treated the same . . . from the standpoint of an accepted zoning criterion," such as parking, traffic control, or generating municipal revenue. *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 373 (7th Cir. 2010).

The Fourth Circuit has yet to rule on this issue. *See Hunt Valley Baptist Church, Inc. v. Baltimore Cty., Maryland*, No. CV ELH-17-804, 2017 WL 4801542, at *32, n.20 (D. Md. Oct. 24, 2017) ("There is a circuit split as to whether a plaintiff states a claim under RLUIPA's equal terms provision by alleging that a zoning law is not facially neutral. . . . To my knowledge, the Fourth Circuit has not addressed the issue."). *Hunt Valley Baptist Church* is now on appeal to the Fourth Circuit and that Court's decision should be forthcoming in the next several months. However, even if the Fourth Circuit were to adopt the more stringent standard for defining "equal terms," this Court concludes that in the present case the Church has met it. The Complaint lists various institutions that are permitted uses within the C-V zone that do not require a special exception, any one of which could constitute a similarly situated comparator. These institutions include cinemas, theaters, open microphone venues, karaoke, poetry or dramatic readings, libraries, and schools for business, art or music. As the Church's counsel aptly phrased it at oral argument,

> If somebody wanted to walk into Laurel, Maryland, sing secular songs, host a karaoke bar, a disc jockey, they wanted to have a hall for the performing arts, sing secular songs,

not a problem, permitted as of right. But if [a house of worship] wants to walk into Laurel, Maryland C-V zone and sing religious songs, they have to acquire a special exception. The same thing for reading – reading important texts allowed, so poetry and dramatic readings, permitted as of right in the commercial village zone, while reading the scriptures in a house of worship context is a special exception, less favorable treatment. Finally, if I want to walk into Laurel, Maryland, study business, study art, they are permitted as of right in Laurel, Maryland. But if I want to walk in and study the bible, a text that I believe has religious significance to me in a house of worship context, I am treated less favorably . . .

June 5, 2018 Hr'g Tr. at 47:25-48:16, ECF No. 36.

The Court finds that the Church has sufficiently pled that the Code treats religious institutions on unequal terms with nonreligious assemblies or institutions. Accordingly, the Motion to Dismiss Count I will be **DENIED**.

### 2. *Violation Of RLUIPA's "Nondiscrimination" Provision (Count II)*

RLUIPA's nondiscrimination provision provides that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or religious institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). In order to establish a claim under this provision, a plaintiff must "show evidence of discriminatory intent." *Jesus Christ is Answer Ministries, Inc. v. Baltimore Cty.*, 303 F. Supp. 3d 378, 397 (D. Md. 2018).

Laurel argues that the Church has failed to set forth sufficient allegations to show discriminatory intent, and that in practice "[t]he City has granted all but one of the Church's applications." MTD at 29, ECF No. 22-1. The Church responds that the close temporal proximity of the adoption of the special exception Amendments and the Church's purchase of the Property allows for the inference that Laurel was "specifically motivated by discriminatory animus against the Church." Opp. at 23, ECF No. 25.

The Fourth Circuit has recognized several factors that are probative of whether a decision-making body was motivated by discriminating intent:

> (1) evidence of a 'consistent pattern' of actions by the decision-making body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decision-making body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decision-makers on the record or in minutes of their meetings.

*Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 584 F. Supp. 2d 766, 781 (D. Md. 2008)

The Church's allegations speak directly to the third and fourth factors. In addition to the proximity in time of the Amendments to the Church's purchase of the Property, the Complaint contains allegations regarding precise statements made by City Planner Burrough that fairly imply that he, and potentially others, may have been motivated by discriminatory animus to deny the Church a parking waiver, followed by amendment of the Code and the sending of the cease and desist letters. While these allegations may well be disputed, the Court would remind that this case is at the Motion to Dismiss stage, with the consequence that the Court is obligated to draw all reasonable inferences in the Church's favor. The Church has sufficiently alleged that the City acted with discriminatory intent and will **DENY** the Motion to Dismiss Count II.

### 3. *Violation of the Equal Protection Clause (Count VIII)*

The Court reaches a similar finding with respect to the Church's Equal Protection claim. "[A] Fourteenth Amendment Equal Protection claim mirrors a RLUIPA nondiscrimination claim . . . [and] also requires a showing of clear and intentional discrimination." *Jesus Christ is Answer Ministries, Inc.*, 303 F. Supp. 3d at 398. Because the Church has sufficiently alleged that Laurel acted with discriminatory intent when it amended the Code, when it denied the parking waiver, and when it sent the cease and desist letters, it has stated a claim under the Equal Protection Clause. The Court will **DENY** the Motion to Dismiss as to Count VIII.

### 4. *Violation Of RLUIPA's "Substantial Burden" Provision (Count III)*

RLUIPA's substantial burden provision "prohibits a governmental entity from imposing

or implementing a land use regulation . . . that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest." *Andon, LLC v. City of Newport News, Va.*, 813 F.3d 510, 514 (4th Cir. 2016) (citing 42 U.S.C. § 2000cc(a)(1)).

The Court first considers whether the Church has sufficiently alleged that the special exception process imposes a substantial burden.

"[F]or RLUIPA purposes, a substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (citing *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981)); *see also Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 557 (4th Cir. 2013) ("When a religious organization buys property reasonably expecting to build a church, governmental action impeding the building of that church may impose a substantial burden."). In *Bethel*, the Fourth Circuit held that a church had been substantially burdened when the county amended water and sewer regulations after the church had purchased its property, effectively preventing any development. In so doing, the Court found it "significant that the County ha[d] completely prevented Bethel from building any church on its property, rather than simply imposing limitations on a new building." *Id.* at 558.

In the present case, the Church posits that it has been similarly burdened by Laurel's zoning Amendments. When it signed the purchase agreement on February 17, 2015, houses of worship and non-profits were allowed to operate within the C-V zone as a matter of right, and

the Church proceeded to sign the purchase agreement and apply for a parking waiver with the understanding that it could operate as both a non-profit coffee shop and a house of worship without having to confront additional regulatory hurdles. All that changed when the City passed Amendment 238, leaving the Church with a $470,000 investment "and no house of worship." Opp. At 25, ECF No. 25.

While the circumstances presented here may not be as drastic as those in *Bethel*, since Amendment 238 did not flatly bar the Church from operating as a house of worship but only added additional restrictions before it could do so, the Court is still satisfied that those additional restrictions would suffice to constitute a substantial burden.

"[O]f course a governmental regulation violates RLUIPA by imposing a substantial burden on religious exercise *only* if the regulation fails to satisfy strict scrutiny." *Bethel*, 706 F.3d at 558 (emphasis in original). Accordingly, if, as the case proceeds, Laurel offers convincing facts showing that Amendment 238 was and is the least restrictive means of furthering a compelling government interest, then the Church's claim under the substantial burden argument would fail.

But for now, the City's response is incomplete.

In its Motion to Dismiss, the City has attached Section 20.7.1 of the Code, which sets forth the "Intent" of each commercial zone. Under *Purposes of specific commercial zones*, the Code states that the purpose for the Commercial Village Zone is:

> to provide for a zone which, (i) encourages the economic stability and improvement of the Main Street Business Area and its immediate environs, (ii) furthers the improvement and retention of the historic character of the Main Street Business District through modification options of the City Planning Commission guidelines on historic preservation of the Historic District Commission, (iii) encourages the continuation and establishment of small business, office uses, skilled craft occupations, and entertainment facilities along with certain residential uses, which are appropriate to the scale and existing character of

the Main Street Business Area, (iv) encourages mixed use of permitted uses appropriate to the Business District.

MTD Ex. C, ECF No. 22-5.

As of the time of oral argument, however, the City had not provided additional information regarding the history and rationale of the special exception requirement for houses of worship; it only attempted to do so by way of a supplemental filing.[3] The Court accepts the supplemental filing insofar as it explains what the special exception process consists of, but will leave for a later stage of the proceedings consideration of the further justifications the City has recently sought to establish at this early stage. The question then at this stage is not whether the City can rebut the Church's claims, but rather, does the Complaint, unrebutted, state causes of action?[4] The Court finds that it does.

---

[3] At oral argument, the Court asked the City a number of questions regarding what the special exception process consists of. On June 8, 2018, the City asked permission of the Court to supplement the record regarding the special exception application process, which the Court interpreted as a Motion to Supplement the Record. ECF No. 35. On June 13, 2018, Counsel for the Church replied that she had no objection to the Motion. ECF No. 37. On June 14, 2018, therefore, the Court granted the Motion and provided Defendant fourteen (14) days "to supplement the record with information regarding the Special Exception process." ECF No. 38.

However, on June 26, 2018, the City filed a supplement that was far more extensive than a straightforward explanation of the special exception process, wading as it did into arguments regarding the reasons for the special exception requirement and how it does not, in the City's view, discriminate on religious grounds. ECF No. 39. On June 28, 2018, the Church filed an Objection to the scope of the City's submission. ECF No. 40.

[4] The Court recognizes that the City's Motion is filed as a Motion to Dismiss, or in the Alternative, for Summary Judgment. The Court's rationale for denying the Motion to Dismiss is discussed herein. The Motion for Summary Judgment, while technically in order, comes at an early stage in the case, before discovery has taken place.

The Church indicates, for example, that at different times it had discussions with the City Fire Marshal, two City Planning Commissioners, and City Planner Burrough, none of which has been reduced to hard evidence by deposition or otherwise. Discovery should help inform a Motion for Summary Judgment filed at a later stage of the proceeding.

Further, the proximity in time between the signing of the Purchase Agreement for the Property, the visit with the Fire Marshal and the enactment of Amendment 238 suffice to raise a question as to the potential existence of actual discriminatory intent. Among other matters of interest would be whether, at the time of

The Court finds that the Church has plausibly stated a claim that the Code creates a substantial burden, such that the City's Motion to Dismiss Count III will be **DENIED**.

5.  *Violation Of The Right To Free Exercise Of Religion (Count IV)*

Under the Free Exercise Clause of the Constitution, the "general proposition" is "that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). In contrast, laws that are not neutral or generally applicable are subject to strict scrutiny and must be justified by a compelling governmental interest that is advanced in the least restrictive means available. *Id.*; *see also Emp't Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990).

In determining whether the Church has stated a claim for violation of the Free Exercise Clause, the threshold question is whether Laurel's Code is neutral and of general applicability. Laurel argues that its zoning ordinance is neutral on its face because its object is not to infringe or restrict religious practices. ECF No. 22-1 at 25. The Church counters that the zoning restriction is not neutral because houses of worship on less than one acre must apply for a special exception to operate in the C-V Zone, "but nonreligious theaters, community centers, schools, and even halls for the performing arts may locate as of right." ECF No. 25 at 19. The Church also argues that the Code is not generally applicable because only certain institutions (churches), and only churches of a certain size (those on less than one acre), must seek a special exception. *Id.*

---

the Church's involvement in the C-V zone, there were any other houses of worship in the same zone, including houses of worship on less than 1 acre, and why (so it appears, a house of worship on more than 1 acre would <u>not</u> be required to pursue the special exception process).

"A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Church of the Lukumi Babalu Aye, Inc*., 508 U.S. at 533. However, "[f]acial neutrality is not determinative." *Id.* at 534. A zoning ordinance that is neutral on its face is not neutral if "the object of a law is to infringe upon or restrict practices because of their religious motivation." *Id.* at 533.

In *Church of the Lukumi Babalu Aye*, the Supreme Court found a land-use regulation not facially neutral when it prohibited activities associated with a particular religion, Santeria, and where the regulation was specifically implemented to target that religion. *Id.* at 534-35. In contrast, land use regulations that generally restrict or prohibit religious institutions from operating within a neighborhood, without a showing of discriminatory intent, have been found to be facially neutral and generally applicable. *See, e.g.*, *Bethel*, 706 F.3d at 561 (finding zoning ordinance that restricts all institutional development in agricultural zone neutral); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 763 (7th Cir. 2003) (holding that a zoning regulation requiring churches and some secular institutions to obtain "Special Use approval" to operate in commercial and business areas facially neutral); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 275 (3d Cir. 2007) (finding a zoning regulation prohibiting all churches from operating within an area "clearly neutral"); *Roman Catholic Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*, 128 F. Supp. 3d 566, 583 (E.D.N.Y. 2015) (finding a zoning law requiring "houses of worship" to obtain a special exception facially neutral because it did not "apply exclusively to Plaintiff or the Roman Catholic religion, but applie[d] equally to all religious institutions").

In the case at bar, Laurel's Code does not prohibit a particular activity practiced by the Church, nor does it distinguish between religions; rather, all houses of worship located on less

than one acre, as well as some secular institutions,[5] must apply for and obtain a special

exception. On the other hand, the Court has already found that the Church has sufficiently

alleged that Amendment 238 may have been motivated in part by discriminatory animus, which

obviously also supports the conclusion that the Code is not neutral or generally applicable.

But, even if the Code were neutral, it would still need to be "rationally related to a

legitimate governmental interest." *Bethel*, 706 F.3d at 561 ("[I]n resolving Bethel's free exercise

challenge we apply rational basis scrutiny, which requires merely that the law at issue be

'rationally related to a legitimate governmental interest.'"). As previously discussed, the City has

provided little to no timely evidence or argument on this point. Accordingly, the Court concludes

that the Church has stated a claim for violation of the right to free exercise, and the Motion to

Dismiss Count IV will be **DENIED**.

### 6. *Violation Of The Right To Free Speech (Count V)*

The Church argues that the Code violates its right to free speech by requiring houses of

worship to ask the City's permission before engaging in religious speech. The City does not

adduce any argument as to why it believes the Church has failed to state a claim as to this

Constitutional provision. In its Opposition, the Church nonetheless maintains that it has

sufficiently pled that the Code infringes on this right. ECF No. 25 at 21-22.

Zoning laws which restrict, but do not prohibit, an entity from operating within a given

area are analyzed as a form of "time, place, and manner regulation" on speech. *City of Renton v.

Playtime Theaters, Inc.*, 475 U.S. 41, 46 (1986). If a regulation is "content-neutral," the

regulation is "acceptable so long as [it is] designed to serve a substantial governmental interest

---

[5] The following secular establishments require a special exception to operate in the C-V zone: bed and breakfast facilities (on at least 10,000 square feet); brewer or pub; live performance by a band or performance group with dancing; performances associated with meetings, wedding receptions, as well as bar and bat mitzvahs; rental halls; restaurants (fast food); restaurants (specialty); restaurants (standard with dancing and live entertainment); and video stores. Complaint Ex. 11, ECF No. 1-13.

and do[es] not unreasonably limit alternative avenues of communication." *Id.* at 47. If a regulation is "content-based," that is, if it was "enacted for the purpose or restraining speech on the basis of its content," then it must be narrowly tailored and justified by a compelling government interest. *Id.*

The Court finds it unnecessary to decide whether the Code is content-neutral or content-based at this juncture. Under either scenario, the City must still explain why it passed Amendment 238 and decided to restrict the operation of houses of worship on less than one acre in the C-V zone. Because the City has failed to do so, the Court finds that the Church has adequately pled a violation of its right to free speech, and the Motion to Dismiss Count V will be **DENIED**.

### 7. *Violation Of The Right To Peaceable Assembly (Count VI)*

As with the free speech claim, the City does not put forth any argument as to why the Church has failed to state a claim for violation of the right to peaceable assembly. The Church maintains that requiring a special exception for houses of worship located on less than one acre, both on its face and as applied, unjustifiably prohibits the Church from peacefully assembling to worship on its property.

When considering a right to peaceable assembly claim, "the state must have a compelling interest in the subject matter to justify abridgment, and the scope of the abridgment itself must not be greater than reasonably necessary to serve the state interest." *Blasecki v. City of Durham, N. C.*, 456 F.2d 87, 91 (4th Cir. 1972). Under this standard, the Court must determine whether Laurel's interest in regulating houses of worship is a compelling interest and whether the special exception process is no greater than reasonably necessary to serve that interest. Because the City has offered  little to no timely information on this point, the Court finds that the Church has

adequately stated a claim for violation of the right to peaceable assembly. The Motion to Dismiss Count VI will be **DENIED**.

### 8. *Violation Of The Establishment Clause (Count VII)*

"The Establishment Clause prohibits Congress and, through the Fourteenth Amendment, the States from making any law 'respecting an establishment of religion.'" *Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283, 287 (4th Cir. 2000) (citing U.S. CONST. AMEND. I). The Establishment Clause "also prohibits the government from favoring one religion over another without a legitimate secular reason." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 992 (7th Cir. 2006).

In evaluating an Establishment Clause claim, a court must draw a line between accommodating religion and establishing religion. In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court articulated a test for drawing that line. Under *Lemon*, for a legislative act to withstand an Establishment Clause challenge, (1) it must have a secular legislative purpose; (2) its principal or primary effect must neither advance nor inhibit religion; and (3) it must not foster excessive governmental entanglement with religion. *Ehlers-Renzi*, 224 F.3d at 287–88.

Laurel argues that the Code is neutral on its face and does not run afoul of *Lemon*, since a "neutral and generally applicable law . . . meets the *Lemon* test as long as it does not excessively entangle government with religion." ECF No. 26 at 12. The Church counters that the Code satisfies none of *Lemon*'s prongs, because its purpose is allegedly to target certain religious assemblies, with the primary effect of enhancing secularism at the expense of religion as well as promoting larger, established churches. Further, according to the Church, the special exception requirement "invites—and has led to—government surveillance of religious speech and expression to determine whether a gathering is a 'house of worship'". ECF No. 25 at 21. The Court finds the Church's argument persuasive.

*Lemon*'s first prong requires the Court to determine whether the Code has a secular legislative purpose. For now, the Court is unable to undertake such an inquiry for the simple reason that it has received no timely evidence regarding Amendment 238's purpose besides the Code's general intent for the C-V zone.

The second prong of *Lemon* "prompts inquiry into whether the statutory exemption has a 'principal or primary effect' that 'neither advances nor inhibits religion.'" *Ehlers-Renzi*, 224 F.3d at 291 (quoting *Lemon*, 403 U.S. at 612). Laurel does not directly address this prong nor does it engage with the Church's allegations that the City promotes secularism over religion and larger, wealthier, and more established churches over smaller religious institutions; that is, larger, wealthier and more established churches, which can afford to purchase property on over one acre within the C-V zone, are treated more favorably than smaller, poorer and less established churches that cannot afford such a purchase. The Court finds this prong weighs in favor of the Church.

The final prong of *Lemon* requires that a legislative act not foster "excessive entanglement with religion." *Brown v. Gilmore*, 258 F.3d 265 (4th Cir. 2001). In *Brown*, the Fourth Circuit held that a regulation allowing local school boards to establish a minute of silence in classrooms for students to "meditate, prey, or engage in any other silent activity" did not violate the Establishment Clause. *Id.* at 270. The law specified that teachers could not suggest "views on whether students should use the time to pray", "use the time to pray aloud in front of other students", or "permit any other student . . . to pray aloud." *Id.* In doing so, the Fourth Circuit found that the regulation did not "excessively entangle[e]" the state because teachers were given no discretion to promote religion. *Id.* at 278.

Unlike *Brown*, in the present case, the Code is not structured in a way that minimizes the discretion of City officials reviewing special exception applications. Nor does the Court as of now have adequate information with respect to how special exception applications are reviewed, the basis on which such applications are granted or denied, and how City officials are trained or monitored to prevent bias. In short, while it cannot definitely be said that the special exception process encourages entanglement, it may fairly be argued that the process could result in inappropriate entanglement. The *Lemon* factors, just described, would permit this inference.

Accordingly, the Motion to Dismiss Count VII will be **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, Laurel's Motion to Dismiss (ECF No. 22) is **DENIED**. The Motion for Summary Judgment (ECF No. 22) is **MOOT**.

A separate Order will **ISSUE**.


_____
**/s/**
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**August 8, 2018**